UNITED STATES DISTRICT COURT
DISTRICT COURT OF MASSACHUSETTS

CIVIL ACTION NO. 09-11998-GAO

HEATHER DOWNING,
Plaintiff,

v.

MICHAEL ASTRUE,
Commissioner of the Social Security Administration,
Defendant.

OPINION AND ORDER
March 28, 2013

O'TOOLE, D.J.

Heather Downing appeals the denial of her application for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits by the Commissioner of the Social Security Administration ("Commissioner"). Downing applied for SSDI and SSI benefits on November 21, 2006, claiming that she was disabled due to hearing loss, attention deficit hyperactivity disorder ("ADHD"), impulse control disorder, a slow ability to learn, and kidney disease (specifically, IgA nephrology). (Administrative Tr. at 158 [hereinafter R.].) Downing previously applied for SSDI on December 15, 2000, and SSI benefits on February 21, 2000. (Id. at 50.) Both applications claimed disability since January 30, 1999. (Id.) The applications were denied on June 13, 2001. (Id.)  Downing again applied for SSDI and SSI on November 21, 2006, but her claims were denied on June 7, 2007.[1] (Id. at 107-15.) A subsequent review by a Federal Reviewing Official was denied as well. (Id. at 39.) Downing filed a request for a hearing before an Administrative Law Judge ("ALJ"). (Id. at 50.) The hearing was held on

---

[1] Because Downing did not appeal the denial of her prior applications, she can only claim disability on or after June 14, 2001.

June 16, 2009. (Id.) After the hearing, the ALJ found that Downing was not disabled. The Decision Review Board did not overturn the ALJ's decision, and it became the final decision of the Commissioner. (Id. at 1.) After exhausting all administrative reviews, Downing filed a timely appeal, pursuant to 42 U.S.C. § 405(g). The sole issue on appeal is whether the ALJ's decision was supported by substantial evidence.

Before the Court are cross-motions to reverse, and alternatively to affirm, the decision of the Commissioner. Concluding that there is substantial evidence in the administrative record to support the ALJ's decision and that no error of law was made, the Court now affirms the Commissioner's decision.

**I.**     **The Claim and the ALJ's Decision**

Downing was born on April 20, 1974. (Id. at 9.) She completed high school and attended college for several years, although she did not obtain a degree. (Id.) Downing was most recently employed as a mail clerk in 2006 and as a telemarketer in 2008. (Id. at 10-11, 140.) She claims disability due to hearing loss, ADHD, impulse control disorder, a slow ability to learn, and kidney disease. (Id. at 158.)

Medical records indicate that she has been treated since 1998 for other chronic health conditions that include hypertension, hiatal hernia, and idiopathic thrombocytopenia. (Id. at 199-220.) She sought treatment as well for syncope, (id. at 210), erosive esophagitis, (id. at 258), duodenitis (id.), and boils on her leg, (id. at 223, 265, 348, 349).

Downing's hearing loss is congenital; she requires hearing aids. (Id. at 7.) On May 8, 2007, Dr. Hemani, an otolaryngologist, examined Downing and opined that her hearing aids were "functioning fine." (Id. at 263.)

Dr. Tolkoff-Rubin is Downing's nephrologist at Massachusetts General Hospital. (Id. 257.) She treats Downing for her kidney disease. After a two-year hiatus, Downing returned for a visit on March 28, 2005. (Id. at 258.) Dr. Tolkoff-Rubin opined that Downing, from a renal standpoint, appeared stable. (Id. at 259.) In 2006, Dr. Tolkoff-Rubin stated that Downing was feeling generally well, but hoped "that emotionally this woman will seek help." (Id. at 257-58.) On October 18, 2007, Dr. Tolkoff-Rubin conducted a follow-up visit and determined that Downing's renal functions were normal. (Id. at 267.) In October 2008, Dr. Tolkoff-Rubin again noted that Downing's renal functions were normal, but "would favor a psychiatric evaluation" for Downing. (Id. at 269.) In January 29, 2009, during a "Physical Capacities Evaluation," Dr. Tolkoff-Rubin noted in a section entitled "Remarks on above or other functional limitations" that Downing was an "Emotional Liability." (Id. at 270.) Dr. Tolkoff-Rubin also wrote "Yes!" in response to the question, "Does a psychiatric condition exacerbate your patient's experience of pain or any other physical symptom?" (Id. at 271.) The evaluation ended with the question "Do you believe that your patient is disabled from competitive substantial gainful employment?" (Id.) Dr. Tolkoff-Rubin answered in the affirmative. (Id.)

On May 21, 2007, psychiatrist Dr. Soto conducted a "Consultative Examination" of Downing. (Id. at 230.) Under the "Mental Status Examination" section, Dr. Soto wrote that Downing was a hyperactive, impatient, and fidgety person. (Id. at 234.) Additionally, Dr. Soto stated that Downing was "very hard of hearing" and that her speech was hesitant and rapid. (Id.) Dr. Soto diagnosed Downing with ADHD, predominately impulsive type; considered bipolar 2 disorder; and ruled out bipolar disorder NOS. (Id.) The evaluation concluded with Dr. Soto opining that Downing was "moderately to severely impaired" in the area of tolerating pressure in

a work environment. (Id. at 235.) Dr. Soto gave Downing a 55-60 Global Assessment of Functioning ("GAF") rating. (Id.)

In June 2007, psychologist Dr. McKenna evaluated Downing's records. Dr. McKenna wrote that Downing presented ADHD, (id. at 237), bipolar disorder, (id. at 239), and personality disorder, (id. at 241). However, McKenna determined that the impairments did not satisfy the criteria of the Commissioner's Listing of Impairments. (Id. at 237, 239, 241.) In a section entitled "Rating of Functional Limitations," Dr. McKenna opined that Downing was only mildly limited in activities of daily living and moderately limited in maintaining social functioning, concentration, persistence, or pace. (Id. at 246.) In the "Mental Residual Functional Capacity Assessment," Dr. McKenna marked that Downing was markedly limited in the ability to understand, remember, and carry out detailed instructions. (Id. at 250.) In all other areas, Dr. McKenna opined that Downing was either moderately or not significantly limited. (Id. at 250-51.) Dr. McKenna concluded that Downing was able to comprehend and recall simple information, could sustain concentration for two-hour increments across an eight-hour work day, and would do best in a setting with limited co-worker and public contact. (Id. at 252.)

In late 2007, psychiatrist Dr. Khajavi examined Downing. (Id. at 287.) In October 2007, he noted that she had been diagnosed with depression, ADHD, and impulse control disorder and was a "good candidate for further diagnostic workup." (Id. at 268.) Dr. Khajavi also stated that she lacked the ability to concentrate, pay attention, and plan tasks to completion. (Id. at 268.) On February 9, 2009, Dr. Khajavi completed a "Mental Residual Functional Capacity Assessment" of Downing. (Id. at 284.) All areas showed some level of limitation. (Id.) Dr. Khajavi checked off that she was markedly limited in twelve areas and moderately limited in eight others. (Id.) In a letter to Downing's attorney, Dr. Khajavi wrote that Downing continued to show difficulty

with concentration, attention, conceptual formation, and other cognitive abilities. (Id. at 287.) She also had a twenty nine on the ADD Scale. (Id.) Dr. Khajavi opined that Downing is incapable of engaging in any gainful activities for any significant period of time. (Id.)

At the hearing before the ALJ, Downing and a vocational expert ("VE") testified. (Id. at 6.) Downing expressed some difficulty hearing, but continued after requesting the ALJ to speak louder. (Id.) During examination by the ALJ, Downing testified that she attended several colleges over a period of four years, but that she did not complete her degree due to procrastination and panic attacks. (Id. at 10.) Downing also testified that while working as a mail sorter and telemarketer she had difficulty communicating and socializing with her co-workers. (Id. at 13.) Downing was then living at the Young Women's Christian Association in Cambridge, Massachusetts. (Id. at 20.) Downing is able to get out of bed, (id.), visit friends, (id. at 21), clean her room, (id. at 23), cook for herself, (id.), and do laundry, (id. at 24). Downing spends her spare time reading literature, listening to music, and playing guitar. (Id. at 22.)

Also at the hearing, the VE testified that an individual with Downing's age, education, vocational background, and non-exertional limitations could find work in both the Massachusetts and national economy. The VE testified that Downing could find work as a mail sorter, bench assemblyman, or hand collator. (Id. at 29.) However, the VE testified that if Downing had marked problems in her concentration to complete simple tasks and an absenteeism of three days a month, she would not be able to maintain employment. (Id. at 31.)

Applying the five-step sequential evaluation process set out in 20 C.F.R. § 416.920, the ALJ concluded that Downing was not disabled as defined under the Social Security Act from the time period between June 14, 2001 and July 29, 2009. (Id. at 59.) The ALJ held that Downing had not performed substantial gainful activity since June 14, 2001. (Id. at 52.) The ALJ also held

that Downing has the following severe impediments: bilateral hearing loss, ADHD, and personality and/or mood disorder. (Id. at 53.) The ALJ also found other impairments that were not severe. (Id.) The ALJ then found that Downing did not have an impairment or a combination of impairments that meets or medically equals one of listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id. at 56.) After examining the record, the ALJ found that Downing had "the residual capacity to perform a full range of work at all exertional levels because she has no exertional or postural limitations but does have the following nonexertional limitations: must avoid concentrated exposure to noise in a work setting, she can understand and remember simple instructions, she can concentrate for two hour periods over an eight hour day on simple tasks, she could interact appropriately with the general public in a work setting and she could adapt to changes in work setting." (Id. at 57.) The ALJ concluded that Downing was capable of performing relevant work as a mail sorter under 20 C.F.R. §§ 404.1565 and 416.965. (Id. at 58.)

## II.     Standard of Review

The Social Security Act provides that factual findings of the Commissioner shall be conclusive if those findings are supported by "substantial evidence." 42 U.S.C. § 405(g). The First Circuit has held that the Commissioner's findings must be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). Further, the Commissioner's decision must be upheld even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence. Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987). It is the Commissioner's responsibility to determine issues of credibility, draw permissible inferences from the evidence, and resolve

conflicts in the evidence. Irlanda Ortiz, 955 F.2d at 769. However, the Commissioner's factual findings are not conclusive when they are "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999). The determination of the ultimate question of disability is for the Commissioner, as opposed to the doctors or the courts. Rodriguez, 647 F.2d at 222 (citing Alvarado v. Weinberger, 511 F.2d 1046, 1049 (1st Cir. 1975) (per curiam)).

### III. The Appeal

First, Downing argues that the ALJ improperly ignored the Physical Capacities Evaluation of Downing's treating physician, Dr. Tolkoff-Rubin. (Pl.'s Mem. in Supp. of Mot. to Reverse 11-12 (dkt. no. 15) [hereinafter Pl.'s Mem.].) However, the ALJ did not ignore that opinion. Indeed, he addressed it directly in his decision. (R. at 58.)

Downing's argument also suggests that the ALJ did not give Dr. Tolkoff-Rubin's opinion enough weight. An ALJ may give a treating physician's opinion controlling weight where the physician's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527. However, an ALJ need not automatically accept a treating physician's conclusions. See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 823-24 (2003). For instance, where an expert opines in an area outside her expertise, the ALJ need not necessarily give that opinion controlling weight. See 20 C.F.R. § 404.1527(d)(2) (ALJ will give less weight to ophthalmologist's opinion on patient's neck pain). In the present case, Dr. Tolkoff-Rubin, a nephrologist, opined that Downing is an "emotional liability." (See R. at 270.) That is, an expert in kidney disease opined on her patient's mental health, an area outside of the doctor's medical expertise. The ALJ notes that the doctor's opinion about Downing's purported disability

"appeared to be based upon psychiatric symptoms and not her physical condition." (Id. at 58.) The ALJ's decision to give less weight to Dr. Tolkoff-Rubin's opinion is not improper here where that opinion was based upon an area outside of her expertise.[2]

Next, Downing argues that the ALJ should have given more weight to Dr. Khajavi's letter stating that Downing was not capable of engaging in "any gainful activities for any significant period of time." (Id. at 287.) Two mental health specialists, however, Dr. McKenna and Dr. Soto, disagreed with Dr. Khajavi's opinion. (Id. at 234-35, 252) It is entirely proper for the ALJ to resolve such conflicts in the evidence. Irlanda Ortiz, 955 F.2d at 769 ("[T]he resolution of conflicts in the evidence is for the Secretary, not the courts."); Gonzalez Garcia v. Sec'y of Health & Human Servs., 835 F.2d 1, 3 (1st Cir. 1987) ("[C]onflicts in the evidence are for the Secretary to resolve."). His resolution of such conflicts does not give the Court sufficient cause to reverse his decision.

The ALJ's decision to give Dr. Khajavi's opinion little weight is further supported by the infrequency of Dr. Khajavi's treatment of Downing. (R. at 58.) In evaluating a doctor's opinion, an ALJ may consider the frequency—or infrequency—of a doctor's relationship with a patient. See 20 C.F.R. § 404.1527(d)(2)(i). In the present case, the ALJ noted that "it does not appear that [Dr. Khajavi] had treated [Downing] since the end of 2007 until her attorney requested an evaluation of her in February 2009." (R. at 58.) Given the gap and infrequency of Dr. Khajavi's treatment, it was not improper for the ALJ's decision to give less weight his opinion.

Downing also argues that the ALJ placed too much weight on the GAF rating in Dr. Soto's report. (Pl.'s Mem. 13-14.) An ALJ may consider a GAF rating to help formulate a

---

[2] Furthermore, there is no indication that Dr. Tolkoff-Rubin used "medically acceptable clinical and laboratory diagnostic techniques" to support her opinion regarding Downing's mental abilities. See 20 C.F.R. § 404.1527(d)(2). Absent use of such techniques, the ALJ did not to give her opinion controlling weight. See id.

conclusion about an applicant's mental capacity. See Howard v. Comm'r of Social Security, 276 F.3d 235, 241 (6th Cir. 2002) ("[A] GAF score may be of considerable help to the ALJ in formulating the [residual functional capacity]."). In this case, the ALJ considered a whole range of materials, including the GAF score. There is no indication that he gave the GAF score too much weight.

The next contention is that the ALJ misstated Dr. Soto's finding that Downing had "moderate symptoms." (Pl.'s Mem. 14-15.) On May 21, 2007, Dr. Soto examined Downing and opined her Axis V condition as "moderately to severely impaired (class 3-4) on a functional level." (R. at 235.) Dr. Soto further wrote that Downing, "meets the criteria for a [GAF] of 55-60." (Id.) After reviewing Dr. Soto's report, the ALJ wrote:

> [T]he opinion of Dr. Soto who has indicated that the claimant had a GAF rating between 55 and 60 and generally ratings in the 50s and 60s support only a finding of *moderate symptoms* and not those which would completely prevent the performance of all types of substantial gainful activity.

(Id. at 58.) (emphasis added). The ALJ used the term "moderate" to characterize the GAF rating, for which a rating in between 51-60 is indicative of moderate symptoms.[3] (Id. at 58.) The ALJ did not misstate Dr. Soto's assessment.

Lastly, Downing argues that the ALJ erred in relying on Dr. McKenna (a non-treating physician) because she claims Dr. Khajavi (a treating physician) was entitled to greater deference under the "treating physician rule." (Pl.'s Mem. 15-16.) This argument is unfounded for two reasons. The first is because "[t]he law in this circuit does not require ALJs to give greater

---

[3] "The Global Assessment of Functioning Scale ranges from 0 ('persistent danger of severely hurting self or others') to 100 ('superior functioning'). A GAF score of 41-50 indicates 'serious symptoms' and 'serious impairment in social, occupational, or school functioning.' *Scores of 51-60 and 61-70 reflect moderate symptoms/moderate impairment in functioning* and some mild symptoms/some difficulty in functioning, respectively." Walker v. Barnhart, No. 04-11752-DPW, 2005 WL2323169, at *4 n.3 (D. Mass. Aug. 23, 2005) (emphasis added).

weight to the opinions of treating physicians." Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 82, 89 (1st Cir. 1991) (citing Tremblay v. Sec'y of Health & Human Servs., 676 F.2d 11, 13 (1st Cir.1982)). Second, as described above, the ALJ did not give controlling weight to Dr. Khajavi as a treating physician "because it does not appear that he had treated her since the end of 2007 until her attorney requested an evaluation of her in February 2009." (R. at 58.) The ALJ based his decision on a range of evidence before him. He did not act improperly where he declined to give greater weight to Dr. Khajavi's opinion.

## IV.   Conclusion

For the foregoing reasons, the plaintiff's Motion to Reverse the Decision of the Commissioner of Social Security (dkt. no. 14) is DENIED, and the defendant's Motion for Order Affirming the Decision of the Commissioner (dkt. no. 18) is GRANTED. The decision is AFFIRMED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge